IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

THOMAS MONTALBANO, JR.

    Plaintiff,

       v.                                           CASE NO.

ARIAD PHARMACEUTICALS, INC.

    Defendant.
_____/

## I.    COMPLAINT

1.    Plaintiff Thomas Montalbano, Jr., ("Plaintiff" or "Montalbano"), by and through his attorneys, Schlesinger Law Offices, P.A., complains against Defendant Ariad Pharmaceuticals, Inc. ("Defendant" or "Ariad") as follows:

## II.    NATURE OF THE CASE

2.    Iclusig, a pharmaceutical drug made, marketed and sold by Defendant, was defective, dangerous to human health, and lacked proper warnings as to the dangers associated with its use when Plaintiff ingested it from July-August 2013. Plaintiff brings this lawsuit to redress his injuries that resulted from ingesting Iclusig.

## III.    PARTIES

3.    Plaintiff resides in the city of Ft. Lauderdale, Broward County, Florida.

4.    Defendant is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. Defendant, at all material times, is in the business of designing, creating, manufacturing, assembling, testing, labeling, supplying, packaging, warning, promoting, marketing, developing, selling and/or distributing the pharmaceutical drug Iclusig, also known as

1

Ponatinib.

## IV. JURISDICTION AND VENUE

5. The Court has jurisdiction under 28 U.S.C. § 1332 because this lawsuit is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

6. Venue is proper in the Southern District of Florida because Defendant committed tortious acts within the state of Florida and the Southern District of Florida out of which acts these causes of action arise.

## V. FACTUAL ALLEGATIONS

### A. Defendant Aimed to Capture a Share of the CML Market

7. Defendant is an oncology company that sells one product: Iclusig. Iclusig is a prescription medicine purportedly made to treat adults who have, among other indications, chronic myeloid leukemia (CML), and who are no longer benefiting from previous treatment or who did not tolerate other treatment.

8. Defendant aggressively and expansively commercialized Iclusig to gain its share of an estimated $4.5 billion global market for CML drugs. Defendant expected the drug would achieve global sales starting at $600 million - $800 million annually, which would grow to several billion dollars a year. Iclusig's retail price was $125,000 per year per user – approximately 17 percent higher than competitors' prices.

### B. Defendant Represented Iclusig Trials Demonstrated the Drug's Safety and Effectiveness, But Defendant Concealed Adverse Data

9. Defendant sought accelerated FDA approval for Iclusig. Defendant took advantage of several FDA programs: (a) fast track designation, which provides rolling or early review of

portions of the application; (b) priority review, which provides for a six-month review schedule; and (c) accelerated approval, which bases approval on a surrogate endpoint or intermediate clinical endpoint, an approach that can shorten approval times and allow more rapid patient access to new drugs while confirmatory studies are still being conducted.

10. Prior to obtaining FDA approval, Defendant touted Iclusig's safety and efficacy in public statements concerning its Phase I and Phase II (also known as PACE) clinical trials.

11. The Phase I trial began in June 2008 and ended in October 2010. During that time, Defendant publicized that Iclusig was "well-tolerated" at the recommended dose level (45mg/day) and produced "beneficial and durable results." Defendant reported that the common adverse events were low-platelet count, rash, arthralgia, headache, and that the less common adverse events were elevated serum enzymes, nausea, fatigue and myalgia.

12. On September 26, 2011, Defendant announced some long-term results of its Phase I trial. There, Defendant stated that "Ponatinib continues to be well tolerated;" "These results reaffirm sustained durable response to ponatinib;" and "Importantly, the data show no new significant safety findings on ponatinib…." Absent from this announcement is mention of arterial and venous thrombosis.

13. Results of Defendant's Phase I study was published in *The New England Journal of Medicine* on November 29, 2012. That article omitted mention of arterial thrombotic events.

14. The Phase II or PACE trial began in September 2010. This trial was designed to produce sufficient data to obtain FDA approval. Defendant completed the Phase II enrollment well ahead of schedule – 449 people were enrolled as of October 2011. Regarding Phase II, on December 11, 2011 Defendant said, "Importantly, this initial assessment of the PACE trial

3

provides further evidence of a favorable safety and tolerability profile of ponatinib...the adverse event profile is similar to what was seen in the earlier Phase 1 study….." Defendant noted that the common adverse events were rash, thrombocytopenia, dry skin, abdominal pain, and headache. Less common events were elevated serum lipase, nausea, fatigue and myalgia. Defendant made similar statements in press releases throughout 2012.

15. On October 24, 2012, Defendant announced that the FDA accepted Defendant's request for Priority Review, and that Iclusig's action date was March 27, 2013. Yet this date was moved forward by about three months, and the FDA granted accelerated approval on December 14, 2012.

16. Just before FDA approval, on December 9, 10, and 11, 2012, Defendant publicized long-term response data on the Phase I and II studies. Consistent with previous announcements, Defendant touted the drug's safety and efficacy and failed to discuss the risk of arterial thrombosis or vascular occlusion.

### C. Defendant Downplayed the Significance of Iclusig's First Black Box Warning, and Downplayed the Seriousness of Heart Problems Attributable to Iclusig

17. On December 14, 2012, Defendant revealed "Important Safety Information" previously not made known, which was part of Defendant's first warning. The warning stated: Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke have occurred in Iclusig-treated patients. In clinical trials, serious arterial thrombosis occurred in 8% of Iclusig-treated patients. Interrupt and consider discontinuation of Iclusig in patients who develop arterial thrombotic events." This warning was the first black box warning.

18. Iclusig's black box warning shocked the public, causing Defendant's stock price to

4

drop 21% the day the drug received FDA approval. Harvey Berger, Defendant's CEO, responded: "The strong, robust efficacy data is what's going to make a huge difference to patients with CML. The boxed warning will have no impact on the use of the medicine."

19. By March 2013, there was increasing news about potential safety issues with Iclusig. On March 27, 2013, Defendant changed the enrollment criteria for Iclusig's Phase III clinical trial, which began in July 2012. Among the changes was an enrollment restriction for those who had suffered heart attacks. Defendant failed to disclose the enrollment changes in its Phase III trial. Instead, Defendant's CEO again stated that Iclusig is well received by doctors and patients and that concerns about the drug's toxicity were overblown. Defendant further publicized that the rate and type of side effects being reported were not different from what Defendant observed in clinical trials.

20. On June 1, 2013, Defendant issued a press release discussing cardiovascular risks and Iclusig. Though Defendant disclosed that serious arterial thrombotic events can be a complication, Defendant attributed those events to the patient's preexisting condition rather than the drug.

21. On July 25, 2013, Defendant adjusted downward the recommended dose, 45 mg, to 30 mg. Following, Defendant stated during a conference call that the downward adjustment had nothing to do with safety concerns surrounding Iclusig's toxicity.

22. Defendant waited until about October 9, 2013 to announce changes in the clinical development of Iclusig and adverse information regarding the results of its clinical trials. Defendant disclosed that serious arterial thrombosis occurred in 11.8% of Iclusig-treated patients. Defendant also announced that its clinical studies is being paused, the dosage will again be

modified downward, and the eligibility criteria for Iclusig will be modified to exclude patients who have experienced prior arterial thrombosis resulting in a heart attack.

23.     Next, on October 11, 2013, the FDA published a safety announcement: "FDA Drug Safety Communication: FDA investigating leukemia drug Iclusig (ponatinib) after increased reports of serious blood clots in arteries and veins." The FDA stated that it was "investigating an increasing frequency of reports of serious and life-threatening blood clots and severe narrowing of blood vessels" in Iclusig-treated patients. The FDA further stated that "at least 20 percent of all participants treated with Iclusig have developed blood clots or narrowing of blood vessels."

24.     On October 18, 2013, Defendant announced that it was terminating its Phase III clinical trial of Iclusig due to the arterial thrombotic events that were observed in Iclusig-treated patients.

25.     The *New England Journal of Medicine* accepted Defendant's amended manuscript on the Phase II study of Iclusig on October 23, 2013 for a publication date of November 7, 2013. In a prior draft of the manuscript, Defendant failed to include information about Iclusig's cardiovascular side effect profile. Upon review, trial investigators urged Defendant to include a section on such events. Instead of following the reviewers' recommendations, Defendant only added two lines addressing these side effects. The information Defendant included in the updated manuscript conflicted with Defendant's second warning stated below.

26.     On October 31, 2013, the FDA issued another safety announcement informing the public that the FDA asked Defendant "to suspend marketing and sales of Iclusig because of the risk of life-threatening blood clots and severe narrowing of blood vessels." The FDA added: "approximately 24 percent of patients (nearly 1 out of 4) in the Phase II clinical trial (median

treatment duration 1.3 years) and approximately 48 percent of patients in the Phase I clinical trial (median treatment duration 2.7 years) have experienced serious adverse vascular events, including fatal and life-threatening heart attack…and severe narrowing of blood vessels in the extremities, heart, and brain requiring urgent surgical procedures to restore blood flow.  In some patients, fatal and serious adverse events have occurred as early as 2 weeks after starting Iclusig therapy."

### D. Defendant's Revised Iclusig Warning

27. Defendant revised its prescribing information in December 2013.  The new black box warning states: "Arterial and venous thrombosis and occlusions have occurred in at least 27% of Iclusig treated patients, including fatal myocardial infarction, stroke, stenosis of large arterial vessels of the brain, severe peripheral vascular disease, and the need for urgent revascularization procedures.  Patients with and without cardiovascular risk factors, including patients age 50 years or younger, experienced these events.  Monitor for evidence of thromboembolism and vascular occlusion.  Interrupt or stop Iclusig immediately for vascular occlusion."

28. The Warning and Precautions Section of the prescribing information further stated: "Iclusig can cause fatal and life-threatening vascular occlusion within 2 weeks of starting treatment…The median time to onset of the first vascular occlusion event was 5 months."  In addition, Defendant provided a table that disclosed the incidence of vascular occlusion in Iclusig-treated patients according to risk categories.  Those 75 and older were at a 46-56% risk of vascular occlusion.  Defendant failed to include this information in its first warning.

29. Moreover, Defendant's second warning stated that patients 65 years or older "are more likely to experience adverse reactions including vascular occlusion…."  Defendant failed to include this information in its first warning.

7

30. Despite the information concerning arterial and venous thrombosis and occlusions contained in its own database, Defendant did not share its information with the FDA, nor did Defendant adequately inform physicians or consumers of Iclusig's propensity to cause arterial and venous thrombosis and occlusions. Instead, Defendant concealed what it knew, and downplayed the serious health risks associated with Iclusig.

31. Upon information and belief, Iclusig was made by Defendant and it was accompanied by drug information and warnings prepared by Defendant.

32. In prescribing Iclusig for Plaintiff, Plaintiff's physicians relied upon the information published in the prescribing information and Defendant's other public disseminations. Plaintiff's physicians were not aware of information indicating the true risk of arterial and venous thrombosis.

### E. Thomas Montalbano Sustained Severe Personal Injuries Because He Ingested Iclusig

33. Plaintiff has chronic myeloid leukemia, CML, and has had CML for about 30 years.

34. Plaintiff was prescribed Iclusig on or about June 11, 2013.

35. Plaintiff was 75 years old when he was prescribed Iclusig.

36. Shortly after taking Iclusig, Plaintiff began experiencing severe adverse health effects including chest pain, shortness of breath, fatigue, rapid heartbeat and hoarseness. A cardiac catheterization revealed coronary artery stenosis, systolic heart failure and Plaintiff needed emergent coronary bypass surgery, which took place on August 16, 2013.

37. Plaintiff's symptoms were relieved when he stopped taking Iclusig – he took the drug for about two months.

38. At the time Plaintiff was prescribed Iclusig, Plaintiff was not warned of Iclusig's

true propensity to cause arterial and venous thrombosis and occlusions. Plaintiff was also not warned that he was at an increased risk due to his age.

39. Had Plaintiff been adequately warned of the true risk of developing arterial and venous thrombosis and occlusions, Plaintiff would not have taken Iclusig.

**CLAIMS FOR RELIEF**

**COUNT I**

**PRODUCTS LIABILITY – DEFECTIVE DESIGN**

40. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

41. At all material times, Defendant engaged in the business of selling, distributing, supplying, manufacturing, marketing and promoting the drug Iclusig, which is defective and unreasonably dangerous to consumers, including Plaintiff.

42. At all material times, Defendant sold, distributed, supplied, manufactured, marketed and/or promoted Iclusig.

43. At all material times, Iclusig was expected to reach, and did reach, consumers in the State of Florida, including Plaintiff, without substantial change in the condition it was sold.

44. At all material times, Defendant sold, distributed, supplied, manufactured, marketed and/or promoted Iclusig in a defective and unreasonably dangerous condition at the time it was placed in the stream of comer in ways that include:

a. When placed in the stream of comer, Iclusig contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff to risks that exceeded the benefits of the drug;

9

    b. When placed in the stream of commerce, Iclusig was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangers that other risks associate with the treatment of CML;

    c. Iclusig was insufficiently tested;

    d. Iclusig caused harmful side effects that outweighed any potential utility;

    e. Iclusig was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Plaintiff, of the full nature and extent of the risks and side effects associated with its use;

45. As a direct and proximate cause of the design defect and Defendant's misconduct as set forth herein, Plaintiff has suffered and continues to suffer serious and permanent physical and emotional injuries.

46. As a further direct and proximate result of the design defect and Defendant's misconduct as set forth herein, Plaintiff incurred expense of medical care, hospitalization, treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and continuing in nation and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT II

## PRODUCTS LIABILITY – FAILURE TO WARN

47. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully

set forth herein and further alleges:

48. Iclusig was defective and unreasonably dangerous when it left Defendant's possession in that it contained warnings insufficient to alert consumers, including Plaintiff, to the dangerous risks and reactions associated with the drug, including the propensity to cause arterial and venous thrombosis and occlusions.

49. Plaintiff could not have discovered any defect in the drug through the exercise of reasonable care.

50. Defendant, as manufacturers and/or distributors of a prescription drug, are held to the level of knowledge of an expert in the field.

51. The warnings that were given by Defendant were not accurate, clear, and/or were ambiguous.

52. Plaintiff, individually and through his physicians, reasonably relied upon Defendant's skill, superior knowledge and judgment.

53. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Iclusig.

54. Had Plaintiff received adequate warnings regarding the risks of Iclusig, he would not have used the drug.

55. As a direct and proximate cause of the inadequate warning and Defendant's misconduct as set forth herein, Plaintiff has suffered and continues to suffer serious and permanent physical and emotional injuries.

56. As a further direct and proximate result the inadequate warning and Defendant's misconduct as set forth herein, Plaintiff incurred expense of medical care, hospitalization,

treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and continuing in nation and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT III

## NEGLIGENCE

57. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

58. Defendant owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling Iclusig.

59. Defendant failed to exercise such reasonable care under the circumstances and therefore breached this duty by:

   a. Failing to properly and thoroughly test Iclusig before releasing it to the market;

   b. Failing to properly and thoroughly analyze the data resulting from the pre-market tests of Iclusig;

   c. Failing to conduct sufficient post-market testing and surveillance of Iclusig;

   d. Designing, manufacturing, marketing, advertising, distributing, and selling Iclusig to consumers, Plaintiff, without adequate warnings of the significant and dangerous risks of Iclusig, and without proper instructions to avoid the harm which could foreseeably occur as a result of using Iclusig;

      e.    Negligently continuing to manufacture, market, advertise, and distribute Iclusig after Defendant knew or should have known of its adverse effects.

60.    As a direct and proximate cause of the Defendant's negligence Plaintiff has suffered and continues to suffer serious and permanent physical and emotional injuries.

61.    As a further direct and proximate result of the Defendant's negligence as set forth herein, Plaintiff incurred expense of medical care, hospitalization, treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and continuing in nation and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT IV

## NEGLIGENT FAILURE TO WARN

62.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

63.    Defendant owed consumers, including Plaintiff, a duty to warn of the foreseeable risks associated with the use of its drug, Iclusig.

64.    Defendant did not warn of or reveal the true risk of cardiovascular events associated with Iclusig.

65.    Defendant's failure to warn of these risks was a breach of Defendant's duty because such risks and dangers of the product were known, or in the exercise of reasonable care, should have been known to Defendant, and in the exercise of reasonable care, such risks should have been

relayed to consumers, including Plaintiff, by a warning.

66. As a result of Defendant's negligent failure to warn, Plaintiff and his prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this complaint.

67. As a direct and proximate cause of the Defendant's negligent failure to warn, Plaintiff has suffered and continues to suffer serious and permanent physical and emotional injuries.

68. As a further direct and proximate result of the Defendant's negligent failure to warn as set forth herein, Plaintiff incurred expense of medical care, hospitalization, treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and continuing in nation and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT V

## NEGLIGENT MISREPRESENTATION

69. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

70. Defendant supplied false information to the public, to Plaintiff and/or his physicians regarding Iclusig's safety and effectiveness. Defendant provided this false information to induce the public, Plaintiff and/or his physicians to purchase and/or prescribe Iclusig. In the exercise of reasonable care, Defendant should have known that Iclusig was defective and/or lacked proper

14

warnings.

72. Defendant knew or should have known that the information supplied, as set forth above, was false and misleading.

72. Defendant was negligent in obtaining or communicating this false information. Defendant negligently misrepresented to Plaintiff and/or Plaintiff's physicians that Iclusig was safe and effective.

73. Plaintiff and/or Plaintiff's physicians reasonably relied on the false information and omissions supplied by Defendant, as set forth above, to Plaintiff's detriment when Iclusig was prescribed and then ingested.

74. As a direct and proximate cause of the Defendant's negligent misrepresentation, Plaintiff has suffered and continues to suffer serious and permanent physical and emotional injuries.

75. As a further direct and proximate result of the Defendant's negligent misrepresentation as set forth herein, Plaintiff incurred expense of medical care, hospitalization, treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and continuing in nation and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT VI

## PUNITIVE DAMAGES

76. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

77. Defendant knew that Iclusig causes debilitating and potentially lethal side effects, or recklessly disregarded this fact, and continued to market Iclusig to consumers, including Plaintiff, without disclosing the true risk of side effects when there were safer alternative methods for treating CML.

78. Defendant knew of Iclusig's defective nature, as set forth herein, but, in conscious and/or reckless disregard of the foreseeable harm caused by Iclusig, continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff.

79. Defendant, to ensure Iclusig's continued and increased sales, intentionally concealed or recklessly failed to disclose to the public, including Plaintiff, the potentially life-threatening side effects of Iclusig. Defendant failed to provide warnings that would have dissuaded physicians from prescribing and consumers from purchasing and consuming Iclusig. Defendant's failure deprived physicians and consumers the ability to weigh the true risks versus benefits of prescribing or purchasing and consuming Iclusig.

80. Defendant committed the aforementioned conduct with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

81. Plaintiff hereby demands a trial by jury on all counts as to all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant on each of the above referenced claims and causes of action as follows:

1. Awarding compensatory damages to Plaintiff;

2. Awarding punitive and/or exemplary damages, in an amount to be determined at trial;

3. Awarding Plaintiff's attorney's fees;

4. Awarding Plaintiff the costs of the proceedings; and

5. Awarding such other and further relief this Court deems just and proper.

March 11, 2015

By: s/Jeffrey L. Haberman
Scott P. Schlesinger (FBN:444952)
Jeffrey L. Haberman (FBN: 98522)
Linda A. Alley (FBN: 0145963)
**SCHLESINGER LAW OFFICES, P.A.**
1212 Southeast Third Avenue
Ft. Lauderdale, FL 33316
jhaberman@schlesingerlaw.com
lalley@schlesingerlaw.com
(954) 320-9507
(954) 320-9509 (fax)

*Attorneys for Plaintiff*